IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| PERRY PATTERSON, <br> Institutional ID No. 1673121 <br><br> Plaintiff, <br><br> v. <br><br> DR. LINDA ROSE, *et al.*, <br><br> Defendants. | § <br> § <br> § <br> § <br> § CIVIL ACTION NO. 5:21-CV-142-BQ <br> § <br> § <br> § <br> § <br> § |

## REPORT AND RECOMMENDATION

Proceeding pro se and *in forma pauperis*, Perry Patterson filed this action under 42 U.S.C. § 1983, alleging violations of his constitutional rights while incarcerated at the Preston E. Smith Unit (Smith Unit) of the Texas Department of Criminal Justice (TDCJ). Patterson seeks monetary damages, as well as declaratory and injunctive relief, for his alleged injuries. Am. Compl. 4, ECF No. 8.

On September 29, 2021, the United States District Judge transferred this case to the undersigned United States Magistrate Judge to conduct preliminary screening. ECF No. 17. The undersigned thereafter reviewed Patterson's Amended Complaint, as well as authenticated records provided by TDCJ, and ordered Patterson to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976). ECF No. 25. Patterson timely completed and returned the questionnaire. ECF No. 27.

Not all parties have consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned makes the following findings, conclusions, and recommendations to the United States District Judge.

I. **Standard of Review**

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such

plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II. Discussion

### A. Patterson's Claims

Patterson asserts claims against the following Defendants: (1) Dr. Linda Rose; and (2) Smith Unit ECB Warden. Am. Compl. 1, 3. In his Amended Complaint and questionnaire responses, Patterson refers to Dr. Woesner and Captain Aimes but does not expressly name them as defendants. Questionnaire 5, 11, ECF No. 27; *see* Am. Compl. 1, 3–4.

Patterson alleges that on or about June 30, 2020,[1] Dr. Rose examined him and thereafter lowered his dosage of the blood thinner Coumadin. Questionnaire 1–2, 4; *see* Am. Compl. 4. According to Patterson, after Dr. Rose made the change, he did not receive any "[C]oumadin at all for about a week or so." Questionnaire 2; *see id.* at 3 (stating that he again began receiving Coumadin sometime between July 7 and 10, 2020). Patterson contends that Dr. Rose is responsible for the lapse because under TDCJ policy, "only providers (not nurses) can prescribe, change or discontinue critical medications."[2] *Id.* at 2.

On September 15 and 17, 2020, Patterson avers that he suffered heart attacks. *Id.* at 4. Patterson asserts that the disruption to, and dosing change of, his Coumadin prescription "[a]ffected [his] heart performance." *Id.* Moreover, he maintains that Dr. Rose "failed to send [him] to appointed emergency heart surgery resulting in more heart attacks and injury and damage to his heart." Am. Compl. 4; Questionnaire 4.

---

[1] The authenticated records indicate that Dr. Rose examined Patterson on July 1.

[2] Patterson refers to the alleged week-long disruption in medication as a discontinuance. *See* Am. Compl. 4; Questionnaire 2.

3

Patterson also references medical shoes in his Amended Complaint. The Court inquired into this ostensible allegation (*see* Questionnaire 5–6) and, in response, Patterson stated that on August 8, 2020, Dr. Woesner prescribed medical shoes, but Patterson never received them. *Id.* at 5; *see* Am. Compl. 4. Patterson alleges that because he did not have medical shoes, he fell on October 9 while assigned to the LeBlanc Unit. Questionnaire 5. In Patterson's estimation, he would not have slipped "walking through a hurricane-flooded side walk [sic]" but for the lack of medical shoes. *Id.* at 6. Patterson, however, has not named Dr. Woesner as a defendant in this action and clarifies that "any defendants [in connection with this claim] are named in the Beaumont U.S.D.C. not relative to N.D. except Rose." *Id.* at 5. Nevertheless, Patterson alleges the "failure to provide any prescribed treatment (shoes) is a constitutional violation." *Id.*

Further, Patterson avers that the Smith Unit Warden left him "in a cell for half a week that could not be opened" in case of emergency. Am. Compl. 4; *see* Questionnaire 9 (stating that his cell door did not open between July 3 and 6, 2020—i.e., three days). Patterson avers that on July 6, 2020, someone fixed his cell door, but shortly thereafter an officer slammed it shut, causing the door to break again. Questionnaire 10. According to Patterson, Smith Unit staff "then moved [him] to" a different cell, though he does not remember the exact date of the move. *Id.* Patterson does not allege he suffered any physical harm or other specific injury as a result of the broken cell door; he states only that he could not use the telephone during that limited time. *Id.*

Finally, Patterson contends that the Warden permitted Captain Aimes "to forcefully remove [his] wedding ring which was never returned." Am. Compl. 4; Questionnaire 11. Captain Aimes apparently removed Patterson's ring before Patterson was transported to the hospital via ambulance on September 17. Questionnaire 11. Patterson seeks monetary damages, as well as declaratory and injunctive relief, related to these alleged constitutional violations. Am. Compl. 4.

### B. Any claim for injunctive or declaratory relief is moot.

Patterson asks the Court to "restore [his] property" and also "[d]eclare the acts violated [his] Constitutional rights." *Id.* Patterson, however, is no longer housed at the Smith Unit—the unit forming the basis of his Amended Complaint—and he pleads no facts showing that he expects to return. *See id.* His requests for declaratory and injunctive relief are therefore moot. *See Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) ("The transfer of a prisoner out of an [offending] institution often will render his claims for injunctive relief moot."); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (noting that even if prisoner were able to establish meritorious claim under the Eighth Amendment, he would not be entitled to injunctive or declaratory relief where prisoner had been transferred to another facility "[a]nd any suggestion of relief based on the possibility of transfer back to the [offending institution] [was] too speculative to warrant relief"); *Qadir v. Eason*, No. 1:01–CV–167–C, 2003 WL 22433910, at *4 (N.D. Tex. Aug. 12, 2003) (explaining that "a prisoner's claims for injunctive and declaratory relief following an alleged violation of the Eighth Amendment may be mooted by his transfer to another prison facility"); *see also Green v. Mansour*, 474 U.S. 64, 73–74 (1985) (holding that a declaratory judgment is unavailable as a remedy for retrospective, as opposed to ongoing, unconstitutional conduct).

Thus, the undersigned recommends that the district judge dismiss Patterson's claims for injunctive and declaratory relief. The only remaining viable relief Patterson seeks are claims for monetary damages.

### C. Patterson has failed to plead facts demonstrating Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

The Constitution requires that prison officials provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an Eighth Amendment violation in regard to medical care must allege facts showing that prison officials were

deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] inmate[] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a

"subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

> 1. *Patterson has not pleaded facts demonstrating that Dr. Rose violated the Constitution by changing his Coumadin dosage, resulting in a temporary disruption in administration of the medication.*

Patterson contends that after examining him, Dr. Rose improperly lowered his Coumadin dosage, which subsequently caused a temporary disruption in administration of the medication. *See* Am. Compl. 4; Questionnaire 1–3. Patterson attributes the disruption in medication to Dr. Rose solely based on his understanding of TDCJ policy—that only "providers (not nurses) can prescribe, change or discontinue critical medications"—and the fact that the "denial of [C]oumadin occurred after Dr. Rose said she'd change dosage." Questionnaire 2. Patterson pleads no facts, however, demonstrating that Dr. Rose was personally involved in a deliberate, temporary denial of medication. *See id.* at 1–3; *see id.* at 7 ("If Rose had not altered my medications, I believe I would've received [C]oumadin delivered to my cell as Smith Unit policy and never missed

anymore doses."). To the contrary, Patterson's questionnaire responses indicate that the disruption may have been due to a pharmacy or supply issue. *See id.* at 3 (stating that in response to his grievance concerning not receiving Coumadin, TDCJ staff responded, "Coumadin ordered pharmacy notified"). Neither Dr. Rose's purported adjustment of Patterson's Coumadin dosage nor the temporary disruption in medication states a viable claim for deliberate indifference.

As to Dr. Rose's decision to adjust Patterson's Coumadin dosage after examining him, such an allegation challenges an exercise of medical judgment.[3] *See Brauner v. Coody*, 793 F.3d 493, 499 (5th Cir. 2015) (describing prisoner's contention that doctor should have prescribed something stronger than mere over-the-counter pain mediation as a "classic example[] of a matter for medical judgment" (citation omitted)); *Alegria v. Adams*, 204 F. App'x 375, 376 (5th Cir. 2006) (per curiam) ("We further hold that the evidence supports the magistrate judge's finding that the adjustments made by [defendants] to [prisoner's] [medication] dosage were medical judgments as opposed to deliberate indifference to his pain."); *Jefferson v. Inglese*, No. 15-3990, 2016 WL 1558780, at *7 (E.D. La. Apr. 8, 2016) ("[C]ontrary to Plaintiff's allegations, [defendant] did not discontinue his medications entirely but simply substituted over-the-counter pain medication for prescription medications, a classic example of a matter of medical judgment."); *Rodriguez v. Duke*, No. 7:10–CV–053–O, 2013 WL 1413026, at *2 (N.D. Tex. Apr. 5, 2013) (concluding inmate failed to state claim for deliberate indifference based on allegation that defendant prescribed an improper insulin dosage, reasoning that "[a]s long as jail medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights"). Essentially,

---

[3] The Court observes that the authenticated records also reflect Patterson was not compliant in taking the prescribed dosage of Coumadin. As a result, on July 1, 2020, Dr. Rose required Patterson to either sign a refusal for Coumadin therapy or agree to comply with prescribed treatment. Patterson does not deny his non-compliance. Questionnaire 6. Instead, Patterson maintains that the missed doses occurred on the Telford Unit and "were for any number of reasons not remotely relevant to the denial of and later decreased dosage of [C]oumadin at Smith Unit." *Id.*

Patterson disagrees with Dr. Rose's medical decision, which does not constitute an actionable claim. *Gobert*, 463 F.3d at 345–46; *Banuelos*, 41 F.3d at 235. And even if Dr. Rose lowered the dosage in error, such a claim amounts to, at best, one for negligence or medical malpractice, which does not rise to the level of a constitutional violation. *See, e.g.*, *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (stating that "malpractice or negligent care does not" amount to a constitutional violation); *Mendoza*, 989 F.2d at 193 ("It is clear that negligent medical treatment is not a cognizable basis upon which to predicate a section 1983 action.").

Turning to Patterson's allegation concerning the lapse in medication, Patterson similarly fails to assert a meritorious claim. Patterson pleads no specific facts demonstrating that Dr. Rose was personally responsible for the lapse, nor does he contend that the disruption was intentional. Instead, Patterson attributes the delay to Dr. Rose because she issued a different Coumadin prescription and, thereafter, he did not immediately receive the updated dosage. *See* Questionnaire 2, 5, 7. Patterson contends that Dr. Rose must have been responsible for the brief disruption in medication because under TDCJ policy, only a provider can "discontinue" a medication. *See id.* But he also acknowledges that in response to his grievance, TDCJ staff informed him the medication had been ordered. *Id.* at 3. Ultimately, Patterson fails to plead facts reflecting Dr. Rose (as opposed to the pharmacy) was personally responsible for the temporary discontinuance in medication, and he likewise does not assert that any disruption was intentional (as opposed to merely negligent). This failure is fatal to his claim. *See, e.g.*, *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action."); *Mendoza*, 989 F.2d at 193.

Moreover, Patterson does not assert that he notified Dr. Rose of the purported lapse in medication or that she otherwise was aware Patterson was not receiving it after she issued the

prescription on July 1. *See* Questionnaire 2–5. To the contrary, Patterson alleges that he did not notify anyone of the issue until July 6, when he wrote an "I-60" to the medical department. *Id.* at 2. According to Patterson, the very next day[4] (or within a few days), he began receiving the updated dosage of Coumadin. *Id.* at 3 (averring that he is "not sure of when [he] began receiving [C]oumadin again" but it was "approximately around July 7–10th, 2020"). The foregoing facts fail to demonstrate that Dr. Rose was aware of a significant risk of harm (the lack of Coumadin) and that she ignored that risk. *See Lawson*, 286 F.3d at 262; *Bailey v. Turner*, 149 F. App'x 276, 279 (5th Cir. 2005) (per curiam) (noting that prisoner had not stated a deliberate indifference claim in part because he did not make an "explicit request for medical treatment").

The undersigned therefore recommends that the district judge dismiss Patterson's claim against Dr. Rose based on her alleged adjustment to, and disruption of, the Coumadin dosage.

   2. *Patterson has not demonstrated that Dr. Rose's purported failure to send him for emergency heart surgery violated his constitutional rights.*

Patterson also alleges that Dr. Rose "failed to send [him] to appointed emergency heart surgery resulting in more heart attacks with injury and damage to his heart." Am. Compl. 4; *see* Questionnaire 3–4. According to Patterson, he "was scheduled for ablation [surgery] on the 23rd of September," but "Dr. Rose failed to have [him] admitted to [University Medical Center (UMC)] for the procedure." Questionnaire 8–9. Although Patterson refers to the ablation procedure as emergent, he states that a doctor has yet to perform the procedure. *Id.* at 9 (averring that the "[d]etails for several procedures are being worked out now on Pack I [Unit] for after [his] motion sickness and legal responsibilities are addressed").

The authenticated medical records show that on approximately September 16, 2020, Patterson was admitted to UMC in Lubbock, Texas, for possible ablation surgery, but that

---

[4] The medical records show Patterson began receiving Coumadin on July 7.

Patterson declined the procedure. Two days later—on September 18—Patterson was again admitted to UMC for chest pain and atrial flutter, at which time he agreed to have UMC physicians perform the procedure. The records show that UMC scheduled the procedure for September 23, with readmission on the 22nd. On September 22, however, Patterson apparently experienced chest pain. The next day, Dr. Rose examined him and ordered certain laboratory tests. In the records, Dr. Rose noted that UMC had scheduled the ablation procedure for September 23.

Dr. Rose examined Patterson again on September 24 in response to Patterson's complaints of "acute loss of feeling [in his] left arm and leg." Dr. Rose documented that Patterson was experiencing atrial flutter and ordered him transferred to the local hospital in Lamesa, Texas, for further evaluation and treatment. Dr. Rose noted that Patterson would "need to be transferred to a 24 hour unit due to pending cardiac ablation."

Thus, even accepting as true Patterson's assertion that Dr. Rose did not send him for surgery on the day scheduled by UMC, the authenticated medical records reflect that Dr. Rose was responsive to Patterson's serious medical needs. Dr. Rose examined Patterson, ordered diagnostic testing, and directed that he be transferred first to the local hospital for immediate care and then transferred to a TDCJ medical unit equipped to address Patterson's needs. That is, Dr. Rose did not completely disregard the UMC physician's recommendation that Patterson return on September 23 for the ablation, but instead acknowledged it and elected a course of action that would ultimately adhere to that recommendation. Although Patterson may disagree with Dr. Rose's chosen course, such disagreement cannot form the basis of a viable constitutional claim. *Gobert*, 463 F.3d at 345–46; *Banuelos*, 41 F.3d at 235. Similarly, disagreement between physicians does not constitute deliberate indifference. *See Stewart*, 174 F.3d at 535 (holding prison physician was not deliberately indifferent when she elected not to follow local hospital surgeon's

11

recommendation that prisoner be transferred to a facility to receive, among other things, physical therapy); *Clifford v. Doe*, 303 F. App'x 174, 175 (5th Cir. 2008) (per curiam) ("A doctor's failure to follow the advice of another doctor suggests nothing more than a difference in medical opinion."); *Muse v. Warner*, No. 93-2413, 1993 WL 543340, at *1 (5th Cir. Dec. 15, 1993) ("The facts alleged by [prisoner], taken as true, show that [prisoner] received medical care from four doctors within a three-month period. The disagreement in diagnosis between the initial doctor and the subsequent doctors does not equal denial of medical care or show deliberate indifference.").

In sum, Patterson's pleadings, in conjunction with the authenticated records, do not show that Dr. Rose "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson*, 759 F.2d at 1238. The Court therefore recommends the district judge dismiss Patterson's claim against Dr. Rose based on her purported failure to send him for surgery.

*3. Patterson has not stated a viable claim based on the alleged lack of medical shoes.*

Patterson maintains that on August 8, 2020, Dr. Woesner prescribed medical shoes, but Patterson never received them. Questionnaire 5; *see* Am. Compl. 4. Patterson alleges that because he did not have medical shoes, he fell on October 9 while assigned to the LeBlanc Unit. Questionnaire 5. In Patterson's estimation, he would not have slipped "walking through a hurricane-flooded side walk [sic]" but for the lack of medical shoes. *Id.* at 6. Patterson, however, has not named Dr. Woesner as a defendant in this action, and has clarified that "any defendants [in connection with this claim] are named in the Beaumont U.S.D.C. not relative to N.D. except Rose." *Id.* at 5. Nevertheless, Patterson alleges the "failure to provide any prescribed treatment (shoes) is a constitutional violation." *Id.*

To the extent Patterson intends to assert a claim based on the alleged failure to receive prescribed medical shoes, he has not stated a cognizable claim. Like his claim against Dr. Rose based on the lapse in Coumadin, Patterson has not pleaded any facts demonstrating that Dr. Woesner was aware Patterson had not received his medical shoes after Dr. Woesner prescribed them. *See* Am. Compl. 4; Questionnaire 5–6. Nor has Patterson alleged facts showing that the lack of medical shoes was the result of deliberate, as opposed to negligent, conduct.[5] *See* Am. Compl. 4; Questionnaire 5–6. And to the extent Patterson intends to attribute the lack of shoes to Dr. Rose, he has wholly failed to plead any facts demonstrating her involvement in the alleged deprivation. *See* Questionnaire 5–6.

For these reasons, the undersigned recommends the district judge dismiss any claim based on Patterson's purported lack of medical shoes.

### D. Patterson has not stated a viable constitutional claim related to an allegedly malfunctioning cell door.

Patterson asserts that between July 3 and 6, 2020, his cell door would not open, either by key or electronically; he therefore could not leave his cell. Am. Compl. 4; Questionnaire 9–10. Patterson alleges that on an unspecified date he asked the Warden to fix it, and the Warden "assured [Patterson] [his] cell door would be fixed soon." Questionnaire 9. According to Patterson, on July 6 someone did fix the door,[6] but another officer subsequently slammed the door and it again broke. *Id.* at 10. Consequently, Patterson avers that Smith Unit personnel moved him to a different cell. *Id.* As a result of the approximate three-day confinement to his cell due to the malfunctioning door, Patterson claims he was "placed . . . in danger of denial for emergency medical treatments" and could not exit "in case of fire." *Id.* Further, he maintains that he was "denied the basic ability

---

[5] The authenticated medical records indicate that after Dr. Woesner prescribed the medical shoes, officials ordered them but Patterson was transferred to the LeBlanc Unit before receiving them.

[6] The records confirm that an individual fixed the door on July 6 in response to a work order placed by Major Dyer.

to question nurses (they did not stop at [his] door for complaints/questions) about medication and [he] could not call or use [the] phones." *Id.*

Under the Eighth Amendment, prison officials have a duty to provide "humane conditions of confinement." *Farmer*, 511 U.S. at 832. That is, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* (internal quotation marks and citation omitted). To establish a constitutional violation, a prisoner must demonstrate that the conditions of his confinement were "sufficiently serious" and that the defendant acted with "deliberate indifference" in the face of knowledge of a "substantial risk of serious harm" to the prisoner. *Williams v. Hampton*, 797 F.3d 276, 280 (5th Cir. 2015). To establish deliberate indifference, the prisoner must show that defendants "(1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).

At the outset, the Court observes that Patterson concedes he did not suffer any physical injury as a result of the malfunctioning door. *See* Questionnaire 10. Under the Prison Litigation Reform Act (PLRA), "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e). The Fifth Circuit has held that this requirement "applies to all federal civil actions in which a prisoner alleges a constitutional violation." *Geiger*, 404 F.3d at 375. The application of § 1997e(e) is based on "the relief sought, and not the underlying substantive violation." *Id.*; *see Mayfield v. Tex. Dep't of Crim. Just.*, 529 F.3d 599, 603, 605 (5th Cir. 2008) ("We have held that the application of [§ 1997e(e)] . . . turns on the relief sought by a prisoner, and that it prevents prisoners from seeking compensatory

damages for violations of federal law where no physical injury is alleged."). Because Patterson alleges no physical injury, his claim for monetary damages is subject to dismissal on this basis alone. *See, e.g., Alexander v. Tippah Cnty.*, 351 F.3d 626, 631 (5th Cir. 2003) (affirming dismissal of prisoners' conditions-of-confinement claims, where they alleged either no or *de minimis* physical injury); *Mackey v. Donald*, No. 1:08-CV-46 (WLS), 2008 WL 7700924, at *2 (M.D. Ga. May 5, 2008) (recommending dismissal of prisoner's claim that cell door was broken for five days, thereby subjecting him to a risk of fire, because prisoner did not allege "any injuries that he personally . . . suffered as a result of allegedly potential fire violations").

Moreover, Patterson fails to plead sufficient facts demonstrating the Warden was deliberately indifferent to a substantial risk of harm. Even assuming Patterson spoke with the Warden on July 3—the day the cell door broke—Patterson concedes that the door was fixed by July 6. Questionnaire 9. Patterson does not plead facts demonstrating the Warden was responsible for any delay in fixing the door, nor has he alleged the Warden ignored his request. *See id.* at 9–10. Patterson merely contends there was a three-day delay, at most, between when the Warden first became aware of the broken door and when the door was ultimately repaired. *See id.* Under these facts, the Court cannot conclude Patterson has sufficiently pleaded facts supporting the subjective prong of his conditions-of-confinement claim against the Warden. *See, e.g., Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020) ("Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." (citation omitted)); *Atkins v. Sheriff's Jail Avoyelles Par.*, 278 F. App'x 438, 439 (5th Cir. 2008) (per curiam) (affirming dismissal of inmate's conditions-of-confinement claim, where he failed to show that "officials disregarded any inference that there was a substantial risk of serious harm" when they allegedly failed to repair a leak, and concluding inmate's "claims amount[ed] only to

claims of unreasonableness or negligence"); *Murray v. Withrow*, No. 2:18-cv-00942, 2019 WL 4734600, at *4 (S.D. W. Va. Sept. 26, 2019) (holding prisoner failed to establish subjective prong of conditions-of-confinement claim, where prisoner alleged that defendants delayed making repairs to his faucet, but did not show that defendants were responsible for the delay or otherwise ignored his complaint about the faucet).

For these reasons, the undersigned recommends that the district judge dismiss Patterson's conditions-of-confinement claim against the Warden.[7]

### E. The Warden and Captain Aimes's alleged confiscation of Patterson's wedding ring did not violate the Constitution.

Patterson alleges that on September 17, 2020, the Warden permitted Captain Aimes to forcibly remove Patterson's wedding ring before Patterson was transported to the hospital via ambulance. Am. Compl. 4; Questionnaire 11. In Patterson's view, the "[l]oss of any property is a constitutional rights violation ($20$^{00}$ or more) sueable [sic] under sec. 1983 . . . ." Questionnaire 12. Patterson is mistaken regarding the law.

An official's actions—whether negligent or intentional—that result in a loss of property constitute a state tort action rather than a federal civil-rights claim. Indeed, a state actor's

---

[7] To the extent Patterson also intends to raise a claim based on the purported denial of access to the phone for several days when his cell door did not open, he has similarly failed to state a claim. The short-term denial of telephone privileges constitutes a *de minimis* level of imposition and does not implicate the Constitution. *See Hamilton v. Lyons*, 74 F.3d 99, 106 (5th Cir. 1996) (affirming dismissal of detainee's conditions-of-confinement claim based on purported denial of "visitation, telephone access, recreation, mail, legal materials, sheets, and showers for a three-day period," concluding that "none of these allegations give rise to a constitutional claim"). Further, Patterson makes a passing statement that the Warden's alleged failure to immediately fix Patterson's cell door caused Patterson to be "discriminated against being denied common rights all other prisoners" received. Questionnaire 10. Patterson's conclusory assertion is insufficient to support an equal protection claim. *See Al-Ra'id v. Ingle*, 69 F.3d 28, 32 (5th Cir. 1995) (explaining that "conclusory allegations of malice are insufficient to maintain" an equal protection claim based on racial discrimination); *Morris v. McCotter*, 773 F. Supp. 969, 973 (E.D. Tex. 1991) ("To succeed on his equal protection claim, Plaintiff must prove he was the victim of purposeful discrimination, either because of membership in a protected class, such as a racial minority, or due to an irrational or arbitrary state classification unrelated to a legitimate state objective."). Finally, the Court observes that Patterson cannot state a viable claim for money damages based on either the denial of phone access or for discrimination because he has alleged no physical harm. *Geiger*, 404 F.3d at 375.

negligence that results in an unintentional loss of property does not violate the Constitution. *See Simmons v. Poppell*, 837 F.2d 1243, 1244 (5th Cir. 1988). Similarly, an intentional deprivation of personal property does not give rise to a viable constitutional claim as long as the prisoner has access to an adequate post-deprivation state remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Stauffer v. Gearhart*, 741 F.3d 574, 583 (5th Cir. 2014) (citing several cases for support) ("An inmate's allegation that his personal property was lost, confiscated, or damaged does not state a claim under 42 U.S.C. § 1983, even when prison officials acted intentionally.").

Here, Texas substantive law provides an adequate post-deprivation remedy for persons asserting claims such as those raised herein by Patterson—pursuing a conversion claim in state court. *See, e.g., Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994). Assuming, without finding, that the Warden or Captain Aimes, or any other person, did in fact remove and then lose Patterson's ring as alleged, Patterson may have a cause of action in state court; however, he cannot pursue a federal constitutional claim. *DeMarco v. Davis*, 914 F.3d 383, 387 (5th Cir. 2019) (affirming dismissal of prisoner's claim that defendant seized his religious materials in violation of TDCJ policy because "Texas's tort of conversion provides an adequate post-deprivation remedy for prisoners claiming loss of property without due process"); *Heard v. Breaux*, No. 1:05cv614, 2006 WL 1899832, at *3 (E.D. Tex. July 11, 2006) (dismissing prisoner's claim that defendants confiscated his wedding ring and watch "for no reason," explaining that the Due Process Clause is not implicated by such a claim); *see Thompson*, 709 F.2d at 383.

The undersigned therefore recommends the district judge dismiss Patterson's property claim based on the alleged loss of his wedding ring.

### III.   Recommendation

For these reasons, the undersigned recommends that the United States District Judge dismiss with prejudice Patterson's Amended Complaint and all claims alleged therein.

### IV.   Right to Object

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: April 27, 2022.

_____
D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE